# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-781V**
**Filed: April 24, 2026**

|  |  |
|---|---|
| RENEE BYNDLOSS,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Master Horner |

*Edward Kraus, Kraus Law Group, LLC, Chicago, IL, for petitioner.*
*Ryan Nelson, U.S. Department of Justice, Washington, DC, for respondent.*

### RULING ON ENTITLEMENT[1]

On June 26, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012).[2]  Petitioner alleged that she suffered bilateral Table Injuries of "SIRVA," *i.e.* a shoulder injury related to vaccine administration, following receipt of measles-mumps rubella ("MMR") and tetanus-diphtheria-acellular pertussis ("Tdap") vaccines administered on May 7, 2018. (ECF No. 1.)  For the reasons set forth below, I conclude that petitioner is entitled to compensation for a left-side Table SIRVA resulting from her Tdap vaccination.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

## I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a), *amended by* 42 C.F.R. § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)    No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

2

(ii)     Pain occurs within the specified time-frame;

(iii)    Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv)    No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a)(1). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their prima facie case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary

hearing.  Vaccine Rule 8(a); Vaccine Rule 8(d).  Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1).

## II.    Procedural History

After petitioner filed her medical records (Exs. 1-7), affidavit (Ex. 8), and a letter from her treating physician (Ex. 9), this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU") (ECF Nos. 10-11).  Petitioner then filed further records (Exs. 10-13) before respondent filed his Rule 4(c) Report in November of 2021 (ECF No. 29).

In his report, respondent recommended against compensation.  (ECF No. 29.) Respondent raised multiple arguments against petitioner's Table injury claims.  (*Id.* at 7-8.)  First, respondent argued that, as a subcutaneous vaccination, petitioner's MMR vaccine cannot support a Table SIRVA.  (*Id*. at 7.)  Second, the vaccine administration records documented both vaccinations as administered in petitioner's left shoulder.  (*Id*.) Additionally, because respondent concluded that only a left-side administration was evidenced, petitioner's presentation of bilateral shoulder pathology confounded any showing under the third SIRVA criterion (pain and reduced range of motion must be limited to the injected shoulder).  (*Id*.)  Moreover, respondent highlighted notations suggesting that, even taking petitioner's left shoulder symptoms unilaterally, the symptoms extended beyond the shoulder to the arm and back.  (*Id*. at 7-8 (citing Ex. 3, pp. 33-34; Ex. 5, p. 2).)  And, finally, respondent disputed that onset of the shoulder pain occurred within 48 hours of vaccination.  (*Id*. at 8.)  Alternatively, respondent contended that petitioner's medical records are insufficient to support any cause-in-fact claim.  (*Id*. at 8-9.)

Subsequently, petitioner filed further medical records (Exs. 14-16), and the parties, at the Chief Special Master's direction, briefed the factual questions of onset, injection situs, and the location of petitioner's pain and reduced range of motion.  (ECF Nos. 30, 34, 36.)  Thereafter, on May 16, 2024, the Chief Special Master issued Findings of Fact and Conclusions of Law.  (ECF No. 40; *Byndloss v. Sec'y of Health & Human Servs.*, No. 20-0781V, 2024 WL 3277098 (Fed. Cl. Spec. Mstr. May 16, 2024).) The Chief Special Master made the following findings based on the record as it existed at that time:

- Petitioner did not preponderantly establish that she received either of her May 7, 2018 vaccinations in her right shoulder.  (ECF No. 40, pp. 9-10; 2024 WL 3277098, at *6-7.)  Instead, the contemporaneous vaccine administration records, which indicated both vaccines were administered on the left-side, were credited.  (ECF No. 40, pp. 9-10; 2024 WL 3277098, at *6-7.)

- Petitioner did not preponderantly demonstrate that her MMR vaccine was administered intramuscularly.  (ECF No. 40, p. 11; 2024 WL 3277098, at

4

*7.)  Instead, the contemporaneous vaccine administration record, which indicated a subcutaneous administration, was credited.  (ECF No. 40, p. 11; 2024 WL 3277098, at *7.)

- There is "preponderant evidence that petitioner's bilateral shoulder pain was not present before vaccination, and that it began at some time afterwards, before the mid-June 2018 massage therapy session – but not necessarily within 48 hours post-vaccination."  (ECF No. 40, p. 11; 2024 WL 3277098, at *7.)

- "Petitioner's injuries were limited to her bilateral shoulders."  (ECF No. 40, p. 12; 2024 WL 3277098, at *8.)  The Chief Special Master further indicated, however, that "I have rejected the allegation of a right-sided vaccine administration, and thus, any right-sided SIRVA.  That finding also seems to endanger the feasibility of a left-sided SIRVA."[3]  (ECF No. 40, p. 12; 2024 WL 3277098, at *8.)

- Petitioner's right-sided Table SIRVA claim was dismissed.  (ECF No. 40, p. 12; 2024 WL 3277098, at *8.)  However, the Chief Special Master felt that a left-sided SIRVA or a non-Table left shoulder injury remained to be litigated.  (ECF No. 40, p. 12; 2024 WL 3277098, at *8.)

After issuance of these findings, the case was transferred out of the SPU and reassigned to the undersigned.  (ECF No. 41.)  I then provided the parties preliminary guidance pursuant to Vaccine Rule 5.  (ECF No. 42.)  I noted that I was less likely than the Chief Special Master to find significance in petitioner's bilateral shoulder conditions relative to a unilateral SIRVA allegation, but I advised that I would likely maintain the Chief Special Master's fact findings.  (*Id.* at 2-4.)  However, I noted that a fact hearing may be appropriate to further address the timing of onset of petitioner's shoulder pain.  (*Id*. at 3.)  I encouraged the parties to explore informal resolution, explaining that

> [i]f the parties are unable to resolve the case informally, then I encourage the parties to determine what, if any, steps they would propose to take to develop the factual record with respect to the above-discussed issues before I permit the parties to engage experts.  If the parties are to retain experts, further discussion will be necessary to determine whether the experts will address a Table Injury and/or a cause-in-fact claim.

(*Id*. at 4-5.)

---

[3] However, he ultimately refrained from ruling as to whether a left-sided SIRVA could be demonstrated.  (ECF No. 40, p. 12; 2024 WL 3277098, at *8.)  Accordingly, the Chief Special Master's finding was only that the injuries were limited to the bilateral shoulders and the additionally expressed concern regarding the significance of that fact is dicta.  (ECF No. 42, p. 4.)

A fact hearing was subsequently held on January 22, 2025. (*See* Transcript of Proceedings ("Tr."), at ECF No. 54.) Petitioner was the sole witness. (*Id.*) Following the hearing, petitioner filed photographs and an additional affidavit expanding on some of the testimony she provided during the hearing. (ECF No. 58; Exs. 19-20.) When the parties reached an impasse in settlement discussions, petitioner then proposed resolving entitlement via written briefs. (ECF No. 56.) Petitioner filed a motion for a ruling on the written record in April of 2025. (ECF No. 60.) That motion is fully briefed. (ECF Nos. 61, 62.) The parties never proposed filing any expert reports.

In light of the above, this case is ripe for resolution of petitioner's entitlement to compensation. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").

## III.    Factual History

### a.    As documented in petitioner's medical records

Prior to the vaccinations placed at issue in this case, petitioner had no relevant prior medical history. She was vaccinated during a routine physical at her primary care provider's office on May 7, 2018. (Ex. 3, pp. 35-39; Ex. 4, pp. 131-32.) Specifically, she received a Tdap vaccine and an MMR vaccine. (Ex. 3, pp. 35-39; Ex. 4, pp. 131-32.) Although petitioner recalls the vaccines as having been administered one in each of her shoulders (Tr. 7), her medical records indicate that she received the Tdap vaccine intramuscularly in her left deltoid and the MMR vaccine subcutaneously in her left triceps (Ex. 4, pp. 131-32).

Petitioner returned to her primary care provider on August 14, 2018, reporting "intermittent bilateral pains in both upper arms over the last 2 months."[4] (Ex. 3, p. 33.) It is noted that petitioner felt some improvement with both massage therapy and exercise, specifically use of a rowing machine. (*Id.*) On physical exam, "[p]ain [was] elicited with movement of the upper arms through ROM, specifically with external rotation. Pain seems to be in the triceps area, but no particular [tenderness to palpation]. No palpable muscle spasm noted." (*Id.* at 34.) Her physician indicated that her condition "seems muscular," but was unable to identify an etiology. (*Id.*) He recommended continuing exercising and to return for a recheck if she did not improve. (*Id.*)

On September 1, 2018, petitioner e-mailed her primary care provider as follows:

> I'm still feeling this strange pain in my upper arms. It's consistent in varying degrees. Something as simple as wiping a table or closing a window is difficult and painful. It's sometimes accompanied with a burning ball of pain in the center of my back and/or soreness in my chest and shoulders.

---

[4] The record is inconsistent in localizing the reported pain to either the biceps or triceps. (Ex. 3, p. 33.)

This is not a result of any exercise.  In fact, I started using a rowing machine and icy hots to alleviate the pain (it helped somewhat).

I'm becoming increasingly concerned.  I'd like to investigate this further somehow.  Should I see some type of specialist?  Tests?  Any recommendations?

Please advise.

(Ex. 5, p. 2.)  In response, petitioner was referred to occupational therapy.  (*Id*. at 1; *see also* Ex. 4, p. 4.)

Petitioner had an initial occupational therapy evaluation on October 4, 2018.  (Ex. 4, p. 4.)  At that time, she provided a pertinent history of "bilateral arm pain beginning 5/7/2018 following bilateral arm vacinations [sic].  Patient reports arms were sore after injections, and pain has continued x 5 months."  (*Id*. at 5.)  Petitioner was noted to have decreased active range of motion bilaterally, which was worse with internal rotation.  (*Id.*)  Her pain was documented to be an eight out of ten, mainly with over shoulder height motion, and she had decreased strength.  (*Id.*)  She also had tenderness from the head of the humerus to the distal 2/3 of the upper arms.  (*Id.*)  The treating therapist recommended ten sessions of twice weekly therapy.  (*Id*.)

Petitioner returned to her primary care provider on November 1, 2018, for both a three-week history of dizziness and left ear pressure, tinnitus, and blockage, as well as "bilateral arm pain since obtained vaccines 5/17/18."  (Ex. 3, pp. 28-29.)  The history further specified that petitioner's arm pain "started about 6 months ago after getting routine vaccinations (Tdap and MMR – one in each arm).  That is the only thing she can think of that has changed."  (*Id*. at 29.)  On physical exam, petitioner had palpable tenderness over the lateral and posterior upper arm bilaterally and significantly decreased range of motion of the shoulders with both passive and active range of motion.  (*Id*.)  Her physician suspected Complex Regional Pain Syndrome and referred her to a pain management specialist (*Id.* at 30), whom she then saw on December 10, 2018 (*Id.* at 22-27).  At that encounter, petitioner again associated her pain to her vaccinations (noting a vaccination date of May 7, 2018), explaining that "[s]he experienced a few days of excepted [sic] soreness after the vaccination, but then had persistent dull, deep, achy pain."  (*Id*. at 22.)  Petitioner had positive impingement tests (Neer's and Hawkin's tests) in both shoulders, but she had coracoid and biceps tenderness only on the left.  (*Id*. at 26.)  A follow up MRI was recommended due to "positive findings concerning for rotator cuff arthropathy/subacromial bursitis versus adhesive capsulitis."  (*Id*. at 27.)

On December 17, 2018, petitioner had bilateral shoulder MRI studies performed.  (Ex. 3, pp. 53-54, 56-57.)  Her right shoulder showed mild tendinosis, labral degeneration with tearing, mild tenosynovial fluid at the biceps groove, a small glenohumeral effusion, and a small amount of subdeltoid bursal fluid.  (*Id*. at 54.)  Her

left shoulder showed mild tendinosis, mild tenosynovial fluid, degeneration of the labrum with tearing, and also mildly increased signal around the glenohumeral ligament potentially consistent with adhesive capsulitis, though another indicator of adhesive capsulitis (synovitis at the rotator interval) was noted to be absent.  (*Id*. at 57.)  Petitioner returned to the pain management specialist to review these MRI findings on December 20, 2018.  (*Id*. at 17-21.)  He felt the MRIs were indicative of tendinosis, bilateral labral tears, and adhesive capsulitis, and referred petitioner to an orthopedic surgeon.  (*Id*. at 20-21.)

Petitioner was then seen by an orthopedist on January 28, 2019.  (Ex. 1, pp. 1-3.)  She again indicated that her bilateral shoulder pain had been present "since her vaccinations," which she specified had been administered bilaterally on May 7, 2018.  (*Id*. at 1.)  On exam, petitioner had pain at the ends of motion with 30% total rotation and 90 degrees of elevation in both shoulders.  (*Id.* at 2.)  The orthopedist also re-reviewed the MRI studies, concluding that the left shoulder had an intact rotator cuff and the right shoulder, though it also had an intact rotator cuff, had evidence of minimal to mild glenohumeral osteoarthritis.  (*Id.*)  He diagnosed bilateral adhesive capsulitis of the shoulders.  (*Id*. at 3.)

This is not the end of petitioner's treatment history; however, the remainder of her medical course is not significant to the analysis that follows.  Petitioner did not subsequently receive any other diagnosis for her condition.  Nor was the orthopedist's diagnosis of bilateral adhesive capsulitis ever subsequently questioned.

    b.  <u>As documented in testimony and other evidence</u>

       i.    Petitioner's Testimony

Petitioner submitted two affidavits and testified at the fact hearing.  (Exs. 8, 20; Tr. 5.)  Petitioner testified that prior to receiving the Tdap and MMR vaccinations during a routine primary care encounter on May 7, 2018, she was in good health with no prior history of shoulder or arm pain.  (Ex. 8, ¶ 3; Tr. 6.)  She recalled receiving one vaccination in each arm (Ex. 8, ¶¶ 3, 5; Tr. 7, 25-26); however, she explained that she has no recollection or knowledge of which vaccination was administered in which arm (Tr. 7).  Specifically, petitioner testified that

> I can't account for how the doctor's office keeps their records.  I can't account for how they technically administered the vaccinations.  I only know that I walked into that office in perfect health, I received the vaccinations in both arms, and I can attest to the immense pain and difficulty that followed for roughly two years.

(*Id.* at 25-26.)

Petitioner described both vaccinations as painful, maintaining that she experienced "injection pain" following the vaccinations and recalled waking up the next

day with a "dull pain in both arms."  (Tr. 7, 27; Ex. 8, ¶ 3.)  She explained that she initially attributed this pain to normal post-vaccination soreness that would diminish with time, noting that her primary care provider had warned her that she would likely experience some pain.  (Ex. 8, ¶¶ 3-4; Tr. 7-8, 30-31.)  When asked to explain the location of her bilateral arm pain, petitioner testified that she experienced pain at the injection sites.  (Tr. 9, 19, 31-32.)  Petitioner maintained that the vaccinations were injected in her arm, motioning that the injection site was approximately three finger widths from the top of her shoulder.  (*Id.* at 31-32.)  While she referred to her pain as "arm pain," petitioner clarified that her pain did not impact her whole arm and did not radiate into her elbow or wrist on either side.  (*Id.* at 32-33.)

Although she initially believed her pain represented normal post-vaccination soreness, petitioner averred her bilateral arm pain continued to get worse over the next couple of weeks, noting that the pain was constant and started fluctuating and flaring up in intensity.  (Tr. 7-8, 28-29, 36-37.)  She stated that "some days the left was worse, other days the right was worse, but they both always hurt."  (*Id.* at 14, 40.)  By approximately two weeks post-vaccination, petitioner's pain "became pretty unbearable" and her shoulders started freezing, which led to difficulty raising her arms.  (*Id.* at 9-10, 45-46, 53.)  Petitioner testified that her worsening pain prompted her to schedule a massage therapy appointment.[5]  (*Id.* at 8-9; Ex. 8, ¶ 6.)  She recalled telling her massage therapist to focus on her arms due to her pain.  (Tr. 51-52.)  In addition to massage therapy, petitioner explained that she tried managing her pain on her own with remedies such as icy-hot, ibuprofen, and using a rowing machine.  (*Id.* at 10, 33, 45; Ex. 8, ¶ 6.)  While these measures provided some relief, her bilateral arm pain persisted. (Ex. 8, ¶ 6; Tr. 10-11.)  As a result of her pain, petitioner testified that she experienced difficulty completing everyday tasks, such as opening doors, performing basic hygiene, and closing windows.  (Tr. 10, 27, 29-30; Ex. 8, ¶ 8.)

Petitioner testified that she sought medical care from her primary care provider in August of 2018, given that her arm pain had become "unbearable" and "debilitating" and it was clear it wasn't going away.  (Tr. 11-12; Ex. 8, ¶ 7.)  During her testimony, petitioner acknowledged that the record for this encounter indicates that her bilateral arm pain had been ongoing for two months, which would place onset in June of 2018. (Tr. 35-36.)  However, petitioner averred that her pain started in May, stating that "I am not responsible for how this office keeps their records.  I have since found, you know, other inaccuracies and contradictions in their paperwork."  (*Id.* at 36.)  Further, petitioner testified that she told her primary care provider that she had been experiencing this pain since the day of her vaccinations, despite this conversation not being recorded in the record.  (*Id.* at 37-38.)  She explained that her primary care provider was dismissive of the idea that her bilateral arm pain was a result of her vaccinations, suggesting instead that her pain was likely due to exercise or physical exertion, even though petitioner "was not an exerciser at the time."  (*Id.* at 12-13, 37-38.)  When she returned to her primary care provider in November, petitioner testified she "was adamant about the vaccines

---

[5] Petitioner testified that she had received massage therapy prior to her vaccinations in May of 2018, noting that these were regular full body massages.  (Tr. 47, 51.)

being the only possible cause" of her pain and was thus referred to a pain specialist. (*Id.* at 15-16.)

Moreover, petitioner recalled the e-mail she sent to her primary care provider on September 1, 2018, that referenced a "burning ball of pain" in the center of her back. (Tr. 37-38.)  She explained that her massage therapist informed her that this sensation was likely due to petitioner's change in posture and restricting the mobility of her arms. (*Id.* at 38, 53-54.)  Specifically, petitioner testified that

> my masseuse figured out that I was walking around holding my hand, my arms, against me, very tightly.  She kept telling me I need to loosen up, I'm causing stress and strain in my back.  I kept – I was walking around just very self-contained and very tight all the time, just trying not to jostle or move my arms as much as I could, so it did cause some stress pain, some stress in my back.

(*Id.* at 39.)  Further, petitioner explained that after her massage therapist pointed this out and she changed her posture, the pain in her back went away.  (*Id.* at 40.)

Petitioner testified that her arm pain improved after approximately two years.  (Tr. 21-22, 25-26; *see also* Ex. 8, ¶¶ 11-17.)  However, she maintained that still experiences arm dysfunction, stating that she has to exercise otherwise she experiences flare ups and acknowledging that she is "never going to be completely pain-free."  (Tr. 22, 48-49.)  She refuses to get vaccinations in either arm, explaining that she received all of her Covid vaccines in her thigh.[6]  (*Id.* at 48.)

ii.    Affidavit of Walter Murcia

Petitioner also filed an affidavit of Walter Murcia, who worked with petitioner at the time she received the vaccinations at issue.  (Ex. 15.)  Mr. Murcia stated that he first met petitioner in 2014, and described her as a "vivacious and energetic" individual who never complained of arm pain prior to her vaccinations.  (*Id.* at ¶¶ 3, 11.)  However, he recalled petitioner "complaining that both of her arms were very sore after she got vaccinations in both arms."  (*Id.* at ¶ 4.)  Mr. Murcia explained that petitioner attempted to alleviate her bilateral arm pain with remedies such as ibuprofen, icy-hot, massage therapy, and exercise; however, petitioner's bilateral arm pain persisted.  (*Id.* at ¶¶ 5-6, 10.)  He maintained that as time went on, petitioner's bilateral arm pain got worse, and caused her increased difficulty in completing simple tasks such as opening doors, holding her phone to her ear, walking her dog, typing for extended periods of time, and operating her stick shift car.  (*Id.* at ¶¶ 7-9.)  He distinctly recalled petitioner demonstrating that she could not lift her arms above shoulder or rest them on her hips.  (*Id.* at ¶ 9.)  Mr. Murcia stated that "I could see that during the spring, summer and fall of

---

[6] In a supplemental affidavit filed after the fact hearing, petitioner acknowledged that one of her medical records for a Covid vaccination indicates the vaccine was administered in petitioner's left shoulder.  (Ex. 20, ¶ 5.)  However, she disputed the accuracy of that record and filed pictures to support her testimony that the vaccines were administered in her thigh.  (*See generally* Exs. 19-20.)

2018, [petitioner] was struggling" due to her bilateral arm pain from her bilateral vaccinations.  (*Id.* ¶ 11.)

        iii.    Letter from Kaela Petty, Certified Massage Therapist

Additionally, petitioner filed a letter authored by Kaela Petty, her massage therapist.  (Ex. 2.)  In the letter dated January 25, 2019, Ms. Petty noted that she had been treating petitioner for approximately four years.  (*Id.* at 1.)  She explained that prior to May of 2018, petitioner presented for periodic massage therapy to address tension in the low back and for stress relief.  (*Id.*)  During that time, petitioner never showed any signs of an acute or chronic injury and never reported acute pain.  (*Id.*)  However, Ms. Petty recalled that at their session on June 16, 2018, petitioner "complained of inexplicable severe pain in both upper arms."  (*Id.*)  Furthermore, Ms. Petty averred that petitioner described the pain as constant with varying degrees of intensity and reported it had been ongoing for approximately one month.  (*Id.*)  When petitioner presented for her next massage therapy session on August 10, 2018, her pain had not resolved prompting her to seek formal medical attention.  (*Id.*)

        iv.    Bodor & Montalvo Article

Petitioner submitted a single article of medical literature by Bodor & Montalvo focusing on vaccine-related shoulder dysfunction.  (Marko Bodor & Enoch Montalvo, *Vaccination-Related Shoulder Dysfunction*, 25 VACCINE 585 (2007) (Ex. 16).)  Bodor & Montalvo present two cases of shoulder and arm pain, weakness, and diminished range of motion following pneumococcal and influenza vaccine injections.  (*Id.* at 1-2.)

In both cases, the patients reported that the vaccines were administered high into the deltoid muscle, within one to two centimeters of the acromion.  (Bodor & Montalvo, *supra*, at Ex. 16, pp. 1-2.)  The authors hypothesized that the vaccine was injected into the subdeltoid bursa in both cases, which likely caused "a robust local immune and inflammatory response."  (*Id.* at 2.)  Because the subdeltoid bursa is contiguous with the subacromial bursa, vaccine administration into the subdeltoid bursa led to subacromial bursitis, bicipital tendonitis, and inflammation of the shoulder capsule.  (*Id.*)  The authors noted that this resulted in a diagnosis of adhesive capsulitis in the first case, and a similar moderate to severe reduction of shoulder range of motion in the second patient. (*Id.* at 2-3.)

Additionally, both subjects had issues with "multiple shoulder structures," including the subacromial space, the bicipital tendon, and the glenohumeral joint. (Bodor & Montalvo, *supra*, at Ex. 16, p. 3.)  Accordingly, the two subjects required multiple injections for resolution of their shoulder pain.  (*Id.*)  The authors noted that this is "consistent with a primary inflammatory etiology rather than a mechanical overuse problem."  (*Id.*)

11

IV.     **Discussion**

    a.  <u>The Chief Special Master's Dismissal of Petitioner's Right-Side Table
        SIRVA Stands</u>

As a threshold matter, petitioner argues that, in light of the undersigned having heard petitioner's live testimony, the Chief Special Master's prior findings of fact, which resulted in dismissal of her right-side Table SIRVA claim, should be revisited.  (ECF No. 60, pp. 10-11.)  Respondent disagrees, arguing especially with respect to the findings as to the site and method of administration of petitioner's MMR vaccine, that petitioner seeks a second "bite at the apple" due entirely to the reassignment to a different special master and without presenting any significant new evidence.  (ECF No. 61, pp. 15-19.)

Generally, special masters may change or revisit any ruling until judgment enters, even if the case has been transferred.  *See McGowan v. Sec'y of Health & Human Servs.,* 31 Fed. Cl. 734, 737-38 (1994).  In most cases, however, a judicial officer such as a special master departs from previously decided issues only in the event of "new evidence, supervening law, or a clearly erroneous decision."  *Id.* at 737; *see also Sullivan v. Sec'y of Health & Human Servs.,* No. 10-398V, 2015 WL 1404957, at *20 n.36 (Fed. Cl. Spec. Mstr. Feb. 13, 2015).  In fact, it is appropriate to give some deference to prior factual determinations of the judicial officer formerly responsible for a matter, assuming circumstances do not demand otherwise.  *See, e.g.*, *Pacific Gas & Elec. Co. v. United States,* 114 Fed. Cl. 146, 149 (2013) (explaining that, when a successor judge is transferred a case in which a prior order has been rendered, the successor judge "should not overrule the earlier judge's order or judgment merely because the later judge might have decided matters differently," but should exercise his discretion in determining if circumstances warrant reopening the previously-determined issue (quoting *United States v. O'Keefe,* 128 F.3d 885, 891 (5th Cir.1997))).  Thus, for example, in *Pitts v. Secretary of Health & Human Services*, I reevaluated a finding of fact made by the Chief Special Master after reassignment out of the SPU primarily because a change in controlling case law was likely to have had a material impact on the Chief's prior analysis.  No. 18-1512V, 2023 WL 2770943, at *8-9 (Fed. Cl. Spec. Mstr. Apr. 4, 2023).  However, consistent with respondent's argument, I have also otherwise advised that petitioners should not expect that the Chief Special Master's findings in SPU cases will be revisited simply as a result of reassignment to another special master.  *E.g.*, *Kuczarski v. Sec'y of Health & Human Servs.*, No. 20-312V, 2023 WL 8713719, at *6 (Fed. Cl. Spec. Mstr. Nov. 17, 2023) (explaining that "as long as a case continues to be litigated there is always a possibility that further record development will necessitate revisiting a prior finding based on newly discovered evidence.  However, petitioners should not view reassignment of a case out of the SPU as a second bite at the apple regarding what has already been decided"); *Molina v. Sec'y of Health & Human Servs*., No. 20-845V, 2024 WL 4223393, at *8-9 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (maintaining the Chief Special Master's findings as to petitioner's alleged Table injury claim).

12

In this case, I heard petitioner's testimony primarily in order to reach a more definitive ruling with respect to the timing of onset of petitioner's shoulder pain relative to her remaining left-side SIRVA claim.  (ECF No. 42, pp. 1-2.)  That does not mean that the testimony cannot also be relevant to other aspects of petitioner's claim; however, based on the testimony elicited, I do not agree that there is any basis to revisit the Chief Special Master's dismissal of petitioner's right-side Table SIRVA claim.  Even assuming petitioner experienced bilateral vaccine administrations as she testified during the hearing, this is would not be dispositive without more.

First, petitioner has not presented any new evidence that would support revisiting the Chief Special Master's conclusion that petitioner's MMR vaccine was administered subcutaneously rather than intramuscularly as documented in her vaccine administration record.  (ECF No. 40, p. 11; 2024 WL 3277098, at *7; Ex. 4, p. 131.)  In fact, she specifically testified that "I can't account for how they technically administered the vaccinations.  I only know that I walked into that office in perfect health, I received vaccinations in both arms, and I can attest to the immense pain and difficulty that followed for roughly two years."  (Tr. 25-26.)  Moreover, in her briefing, petitioner agrees that "MMR is generally given subcutaneously."  (ECF No. 60, p. 12.)  Thus, petitioner effectively acknowledges that there is no basis to even be suspicious that the administration record may be incorrect as to the method of administration.  As I have previously observed,

> it is important that special masters recognize that vaccine administration records can sometimes be incorrect and that they should not be accepted reflexively.  However, that is a far cry from presuming they are to be distrusted generally or without good reason.  Vaccine administration records are still, after all, contemporaneous medical records.

*Anderson v. Sec'y of Health & Human Servs*., No. 20-195V, 2023 WL 2237320, at *10 (Fed. Cl. Spec. Mstr. Feb. 2, 2023).  Instead, the only reason petitioner provides to potentially doubt that her MMR vaccine was administered subcutaneously is the fact of her alleged SIRVA.  (ECF No. 60, pp. 12-13.)  However, this is not persuasive without more.[7]  *Accord Anderson*, 2023 WL 2237320, at *14 (explaining that it "begs the very question of this litigation" for petitioner to argue that the fact of her SIRVA allegation should, in itself, override a contradictory vaccine administration record).

This is significant because, as the Chief Special Master previously observed in his findings of fact, the Vaccine Injury Table specifies that SIRVAs result from vaccines "intended for intramuscular administration in the upper arm."  42 C.F.R. § 100.3(c)(10).  Thus, a subcutaneous vaccine administration does not provide a basis to assert a Table SIRVA, as has been addressed in a prior reasoned decision by another special master.

---

[7] Moreover, as discussed in the below analysis of petitioner's left-shoulder SIRVA, her orthopedist concluded that her right, but not left, shoulder demonstrated evidence of glenohumeral osteoarthritis, which would be more likely to be degenerative than post-vaccinal.  *E.g.*, *Pulsipher v. Sec'y of Health & Human Servs.*, 21-2133V, 2025 WL 1364203 (Fed. Cl. Spec. Mstr. Apr. 24, 2025), *mot. for rev. denied*, 179 Fed. Cl. 268 (2025).

*See A.P. v. Sec'y of Health & Human Servs.*, No. 17-784V, 2022 WL 275785, at *13-15 (Fed. Cl. Spec. Mstr. Jan. 31, 2022).  Petitioner argues otherwise, noting that SIRVA is listed as a Table injury relative to the MMR vaccine despite the fact that it is generally administered subcutaneously.  (ECF No. 60, pp. 12-13; ECF No. 62, pp. 3-4.)  However, this argument was previously rejected in *A.P.* and I agree with the analysis in that case*.* 2022 WL 275785, at *13-15.  Petitioner also notes that prior petitioners have been compensated for shoulder injuries related to MMR vaccines (ECF No. 60, p. 13); however, the cases petitioner cites do not support the idea that a subcutaneous administration provides a basis for a Table SIRVA.  *A.P.*, 2022 WL 275785, at *26-29 (finding entitlement to compensation based on causation-in-fact)*; see also Chappell-Strickland v. Sec'y of Health & Human Servs.*, No. 18-396V, 2021 WL 610136 (Fed. Cl. Spec. Mstr. Jan. 27, 2021) (finding the record evidence in that case "more consistent with unintended intramuscular administration of the MMR vaccine").  Therefore, even if I accepted petitioner's account of a bilateral administration, this would still not support the assertion of bilateral Table SIRVAs.

Second, based on the vaccine administration record, the Chief Special Master found that petitioner's intramuscularly administered Tdap vaccine was more likely than not administered in her left shoulder.  (ECF No. 40, pp. 9-10; 2024 WL 3277098, at *6-7.)  In her testimony, petitioner described a bilateral administration (Tr. 7, 25-26), which she also further stressed in her briefing (ECF No. 62, pp. 1-3).  However, petitioner specifically disclaimed any recollection as to which vaccination was administered in which shoulder.  (Tr. 7.)  Nor does petitioner argue in her briefing that she has any other basis for asserting that her Tdap vaccine was administered in her right rather than left shoulder.  Indeed, in her motion petitioner affirmatively urges that, if bilateral SIRVAs are not accepted, "a finding of a SIRVA injury from petitioner's Tdap vaccination in the left shoulder and a right shoulder injury caused-in-fact by her MMR vaccination."  (ECF No. 60, p. 21.)

Accordingly, petitioner has not presented any new evidence that would disturb the Chief Special Master's reliance on petitioner's vaccine administration record to identify the location of her Tdap injection.  In other words, even considering petitioner's subsequent testimony, I likewise find that the evidence preponderates in favor of a finding that petitioner's Tdap vaccine was administered in her left shoulder.  Again, as noted above, absent some demonstration of a basis for doubt, vaccine administration records are contemporaneously recorded medical records generally deserving of significant weight.[8]  *E.g.*, *Anderson*, 2023 WL 2237320, at *10.

---

[8] Even if crediting petitioner's testimony of bilateral injections would necessarily require the additional conclusion that one of petitioner's two vaccine administration records is incorrect, the evidence would still be insufficient to determine which of petitioner's two vaccine administration records was incorrect.  Thus, the evidence would at best remain in equipoise with respect to which vaccine was administered in the right shoulder.  Therefore, petitioner still would not be able to preponderantly establish that she received an intramuscular vaccination in her right shoulder.  *See Doe v. Sec'y of Health & Human Servs.*, 83 Fed. Cl. 157, 169 (2008) (indicating that "[i]f the record evidence is in equipoise on any requisite element of proof, the party bearing the burden of proof with respect to such element cannot prevail because it has not marshaled a preponderance of the evidence in its favor"); *see also Knudsen v. Sec'y of Health &*

For all these reasons, even after having heard petitioner's live testimony, I conclude that petitioner has not presented any new evidence that would disturb the Chief Special Master's dismissal of her right-side Table SIRVA claim.  Moreover, for the same reasons, even if I did revisit the Chief Special Master's conclusion, I would still conclude based on the further developed record that dismissal of petitioner's right-side Table SIRVA claim is appropriate.

      b.  <u>Petitioner has not Alternatively Demonstrated any Shoulder Injury Caused-in-Fact by her MMR Vaccination</u>

As noted above, prior petitioners have been compensated for shoulder injuries caused-in-fact by subcutaneous vaccine administrations.  *A.P.*, 2022 WL 275785, at *26-29*.  In that regard, petitioner does include in her motion the bare assertion that her presentation can demonstrate that her MMR vaccine caused-in-fact her right shoulder condition even in the absence of a Table injury.  (ECF No. 60, pp. 13-14, 21; ECF No. 62, p. 10.)  However, this assertion is not substantiated.  In particular, petitioner has not set forth any theory of causation that could meet her burden of proof under *Althen* prong one.  Petitioner did file a single article by Bodor and Montalvo with respect to the potential clinical manifestations of SIRVA.  (ECF No. 60, p. 19 (citing Bodor & Montalvo, *supra*, at Ex. 16).)  However, neither of the subjects included in that literature were noted to have received a subcutaneous vaccination.  (Bodor & Montalvo, *supra*, at Ex. 16, pp. 1-2.)  Moreover, even if one merely assumed that a subcutaneous injection could cause a shoulder injury in the same manner as an intramuscular injection, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).  In this case, however, none of petitioner's treating physicians actually opined that petitioner's condition was vaccine-caused, let alone caused by the MMR vaccine specifically, even as they repeatedly noted the fact of the vaccination as part of petitioner's reported history.  Nor did petitioner file any expert report to support her claim.  Accordingly, even if assuming a bilateral administration, petitioner has not demonstrated that her MMR vaccination caused-in-fact any injury to her right shoulder.[9]

      c.  <u>Petitioner's Left-Side Table SIRVA</u>

With respect to petitioner's left-side Table SIRVA allegation, only two of the four QAI criteria are disputed.  (ECF No. 61, p. 8.)  Respondent argues that petitioner has

---

*Human Servs.*, 35 F.3d 543, 551 (Fed. Cir. 1994) (finding the government did not meet its burden on alternative causation because the evidence was in equipoise).

[9] In her motion, petitioner specifically premises her potential cause-in-fact claim on the assumption that she received her MMR vaccine in her right shoulder.  (ECF No. 60, p. 21.)  Notably, however, for the reasons discussed in the preceding section, I did not actually need to resolve the injection situs for petitioner's MMR vaccine to conclude that the Chief Special Master's dismissal of the right-side SIRVA must stand.  Therefore, I have not actually reached any conclusion that petitioner's vaccines were administered bilaterally or that she received her MMR vaccine in her right shoulder.

not demonstrated that onset of her shoulder pain occurred within 48 hours of vaccination (criterion (ii)), and also that petitioner has not demonstrated that her pain was limited to the shoulder in which the vaccine was administered (criterion (iii)).  (*Id*.)

> i.  SIRVA QAI (2) – Pain occurs within the specified time-frame (*i.e.* 48 hours)

The second SIRVA criterion requires that the petitioner experience an onset of shoulder pain within 48 hours of the vaccination at issue.  42 C.F.R. § 100.3(c)(10)(ii). The Vaccine Act explicitly instructs that a special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period."  § 300aa-13(b)(2). However, such a finding must in all events be supported by preponderant evidence.  *Id*.

As discussed in my prior Rule 5 Order, the Chief Special Master's finding of fact with respect to the onset of petitioner's shoulder pain was inadequate to resolve whether she experienced a left-side Table SIRVA.  (ECF No. 42, p. 3.)  Specifically, he found "preponderant evidence that petitioner's bilateral shoulder pain was not present before vaccination, and that it began some time afterwards, before the mid-June 2018 massage therapy session – but not necessarily within 48 hours post-vaccination."  (ECF No. 40, p. 11; 2024 WL 3277098, at *7.)  Simply put, the Chief Special Master declined to determine whether or not onset of shoulder pain occurred within 48 hours of vaccination.  With the added benefit of petitioner's subsequent testimony, I now more specifically find that the evidence preponderates in favor of finding that petitioner experienced an onset of shoulder pain within 48 hours of her vaccination.

Petitioner testified that she had what she thought was normal "injection pain" on the date of her vaccinations and that when she woke up on May 8, 2018, the day after her vaccination, she had "dull pain in both arms," which she still thought was only normal post-injection soreness, but which instead got increasingly worse over the next couple of weeks, eventually prompting her to schedule a massage therapy appointment. (Tr. 7-8.)  Petitioner also filed a corroborating letter by her massage therapist indicating that petitioner complained of an approximately one month-long history of severe pain in both upper arms at an appointment on June 16, 2018.  (Ex. 2, p. 1.)  Although the earliest available documentation of petitioner's shoulder pain is less clear as to an immediate post-vaccination onset (Ex. 3, p. 33; Ex. 5, p. 2), I do not find that this significantly undermines petitioner's testimony.  These earliest records are generally better characterized as vague, rather than contradictory.  Moreover, her later treatment records are otherwise clear and explicit in repeatedly associating petitioner's shoulder pain to her vaccinations, often specifically placing onset immediately post-vaccination. (Ex. 4, p. 5 ("bilateral arm pain beginning 5/7/2018 following bilateral arm vacinations [sic].  Patient reports arms were sore after injections, and pain has continued x 5 months"); Ex. 3, p. 28 ("bilateral arm pain since obtained vaccines 5/17/18" (albeit misdating the vaccinations)); Ex. 1, p. 1 ("she reports onset after she received vaccine

16

shots in both shoulders on 5/7/18 . . . She explains that since her vaccinations, she has significant pain and stiffness . . .).)

Respondent stresses that the massage therapist's letter does not associate petitioner's pain to her vaccination. (ECF No. 61, pp. 11-12.) Moreover, he urges that when petitioner later sought formal medical care on August 14, 2018, the history she initially provided was of a two-month history of shoulder pain, which places onset of her condition in mid-June. (*Id*. at 9-10 (citing Ex. 3, p. 33).) He argues that petitioner's testimony is inadequate to explain or overcome this medical record. (*Id*.) However, even without the benefit of petitioner's testimony, the Chief Special Master's conclusion that onset of petitioner's shoulder pain occurred "before the mid-June 2018 massage therapy session" already implicitly rejected the argument that the August 14, 2018 medical record is dispositive of onset. (ECF No. 40, p. 11; 2024 WL 3277098, at *7.) I agree. And, notably, the August 14, 2018 record itself corroborates that petitioner first resorted to massage therapy to treat her shoulder pain.[10] (Ex. 3, p. 33.)

Respondent additionally argues that it is significant that petitioner waited a month to seek treatment and five months before explicitly associating her pain with her vaccinations. (ECF No. 61, pp. 9-13.) While respondent is not incorrect that these factors can be probative, I do not find them compelling in this case. As explained above, a greater number of medical treatment records are explicit in identifying an immediate post-vaccination onset of shoulder pain and those that are not, are vague more so than to the contrary. Respondent also argues that the evidence does not clearly reflect that petitioner was experiencing "debilitating" pain prior to her August 14, 2018 encounter. (ECF No. 61, p. 10.) He contends that this is in contrast to petitioner's testimony, which he characterizes as asserting that petitioner's pain was "debilitating" and "unbearable" from the time of the vaccinations. (*Id*. (citing Tr. 11, 37-38).) However, I do not find that to be a fair interpretation of petitioner's testimony. Petitioner was clear in testifying that her pain worsened over weeks. (Tr. 7-8.) Moreover, regardless of whether the medical record explicitly discussed whether petitioner's condition interfered with her daily activities, the record reflects a history of shoulder pain that was sufficient to prompt medical attention as well as a physical examination that confirmed petitioner's painful range of motion. (Ex. 3, pp. 33-34.) Ultimately, none of the minor inconsistencies cited by respondent (ECF No. 60, pp. 10-11) convince me that an immediate post-vaccination onset of shoulder pain should be doubted.

For these reasons, petitioner has met her preponderant burden of proof under the second SIRVA criterion.

---

[10] I do note that the August 14, 2018 encounter record states "[n]o particular triggers identified." (Ex. 3, p. 33.) However, this is in the context of discussing petitioner's report that her pain "[v]aries in intensity." (*Id*.) Accordingly, I find that this reference to triggers, plural, likely refers to potential aggravating factors rather than the initial onset of petitioner's pain. (*See id*.)

      ii.     SIRVA QAI (3) – Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered

The third SIRVA criterion requires that the post-vaccination pain and reduced range of motion be limited to the affected shoulder.  42 C.F.R. § 100.3(c)(10)(iii).  This requirement encompasses an affirmative showing that the petitioner's presentation included a reduction in range of motion.  *Bolick v. Sec'y of Health & Human Servs.*, No. 20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023).  Otherwise, the third SIRVA criterion focuses on whether "the condition is localized to the shoulder." *Chu v. Sec'y of Health & Human Servs.*, 180 Fed. Cl. 37, 74 (2026) (citing 82 Fed. Reg. 6294, 6296); *see also Grossmann v. Sec'y of Health & Human Servs.*, No. 18-00013V, 2022 WL 779666, at *16 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (finding the third SIRVA criterion met where "the evidence does not preponderate in favor of any finding that petitioner had diagnostically meaningful complaints of pain or reduced range of motion beyond her left shoulder"); *Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder").

Respondent "acknowledges the possibility that one can suffer two independent shoulder injuries.  However, the facts of this case do not support the idea of two separate SIRVA[s] with simultaneous symptoms.  Rather, the facts of this case support a unifying etiology to petitioner's bilateral shoulder pain." (ECF No. 61, p. 14.)  First, respondent argues that petitioner could not have suffered a right-side SIRVA.  (*Id.*)  Second, he argues that none of petitioner's treaters categorized her condition as "two separate, coincidently occurring shoulder injuries."  (*Id.*)  And, third, respondent stresses that, regardless of whether petitioner's two shoulder MRIs had distinct findings, the objective findings and clinical presentation of both shoulders were substantially identical.  (*Id.* at 14-15.)  Moreover, [i]t is petitioner's burden to prove the significance, if any, of the distinct findings on MRI."  (*Id.* at 15.)

Without a doubt, having concluded that petitioner has not preponderantly demonstrated on this record that her right shoulder condition is vaccine-related, the simultaneous onset of adhesive capsulitis in both shoulders in the setting of a left-side SIRVA would be an extraordinary coincidence.  However, respondent's argument misses a fundamental and critical point.  The fact that petitioner's right shoulder pain was not a SIRVA does not imply that adhesive capsulitis of the right shoulder would be any explanation for left shoulder pain and reduced range of motion.  Thus, respondent has not actually described any unifying etiology even as he implies one is present.  Indeed, the fact that respondent has not raised any argument as to the fourth SIRVA criterion – whether any other condition or abnormality is present that would explain the patient's symptoms – further underscores that he has not identified any condition that would explain both petitioner's right and left adhesive capsulitis as manifestations of a single condition.

Adhesive capsulitis,[11] which respondent acknowledges to be the diagnosis rendered for each of petitioner's shoulders by her orthopedist, is a condition *of the shoulder itself*.  It can be consistent with SIRVA but also has other causes.  *Forrest v. Sec'y of Health & Human Servs.*, No. 17-1905V, 2023 WL 2493263, at *13-16 (Fed. Cl. Spec. Mstr. Feb. 15, 2023).  Notable in that regard, the treating orthopedist interpreted petitioner's right shoulder MRI as additionally evidencing glenohumeral osteoarthritis that was not also remarked upon for the left shoulder.  (Ex. 1, p. 2.)  And, regardless of whether the specific MRI findings of each shoulder were distinct, the key factor is that petitioner's treating orthopedist felt that the MRI findings were indicative of the presence of adhesive capsulitis in each shoulder.  (*Id.* at 2-3.)  Thus, the medical opinion of record does, in fact, support the conclusion that petitioner's left shoulder pain is explained by pathology consistent with SIRVA while her right shoulder pathology is separately explained by right shoulder pathology.  (*Id.* at 2 (noting "signs, MRI, and symptoms are consistent with bilateral adhesive capsulitis").)[12]

If respondent had nonetheless wanted to demonstrate that the coincident nature of this bilateral adhesive capsulitis implicated some other trigger that could explain simultaneous presentation of the condition in both shoulders, then that would be an issue best addressed as a factor unrelated to vaccination rather than as part of petitioner's prima facie burden of proof under the Table criteria.  § 300aa-13(a)(1)(B).  Critically, however, respondent has not identified what that trigger would be, and unexplained or hypothetical conditions cannot serve as a "factor unrelated" under the statute.  § 300aa-13(a)(2)(A).

Respondent additionally notes that petitioner's e-mail to her primary care provider on September 1, 2018, reported that her symptoms are "sometimes accompanied with a burning ball of pain in the center of my back and/or soreness in my chest . . . ."  (ECF No. 61, p. 15 (citing Ex. 5, p. 2).)  Petitioner testified that this was related to holding her arms tightly against her body as a result of her shoulder pain.  (Tr. 39-40.)  Specifically, petitioner indicated that this was explained to her by her massage therapist.  (*Id.*)  Respondent rejects this explanation, however, because it is not supported by any medical opinion.  (ECF No. 61, p. 15.)  Despite this explanation resulting from lay testimony, I do give some weight to petitioner's personal observation that this symptom responded to a change in posture after she became aware of the

---

[11] Adhesive capsulitis is a condition involving "adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa."  The condition is characterized shoulder pain of gradual onset, along with increasing pain, stiffness, and limited or reduced range of motion.  Adhesive capsulitis is also known as adhesive bursitis and frozen shoulder.  *Adhesive capsulitis*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=62985 (last visited Apr. 15, 2026).

[12] As I noted in the Rule 5 Order, the parties might have been able to seek additional discovery to parse the treating orthopedist's phrasing of "bilateral adhesive capsulitis of shoulders" (ECF No. 42, p. 4 (citing Ex. 1, pp. 2-3)); however, they did not.  And the orthopedist's statement is not necessarily best interpreted as being suggestive of a unifying diagnosis, because "[t]he two shoulder joints are two distinct joints, and absent some clinical suspicion of a unifying diagnosis, it is not clear that discrete musculoskeletal joint injuries can be unified merely because they happen to co-occur."  (*Id.* at 3-4.)

potential connection.  (Tr. 39-40.)  But in any event, the record does not clearly establish that the back or chest complaint was related to her shoulder condition. Although petitioner indicated in her e-mail that these symptoms "sometimes accompanied" her other symptoms, the record establishes that the time course of the back and chest complaint was not the same (Tr. 39-40), and at the time she reported it, petitioner explicitly disclaimed having any understanding of the reason for her various symptoms (Ex. 5, p. 2).  No physician ever documented that a "ball of pain" in petitioner's chest or back was diagnostically significant to her shoulder condition and, as discussed above, she was ultimately diagnosed by her orthopedist as having "signs, MRI, and symptoms are consistent with bilateral adhesive capsulitis."  (Ex. 1, p. 1.)  The Court of Federal Claims has held that QAI criterion three is not "intended to foreclose compensation for petitioners who have two (or more) separate conditions . . . [S]o long as petitioner has one condition localized to the shoulder, SIRVA is satisfied."  *Chu*,180 Fed. Cl. at 74 (citing 82 Fed. Reg. 6294, 6296).

For these reasons, petitioner has met her preponderant burden of proof under the third SIRVA criterion.

### d.  Factor unrelated to vaccination

Once petitioner has met her own prima facie burden of proof, respondent may still demonstrate by a preponderance of evidence that the injury was nonetheless caused by a factor unrelated to the vaccination.  § 300aa-13(a)(1)(B).  In order to meet his burden of proof, respondent must demonstrate by preponderant evidence "that a particular agent or condition (or multiple agents/conditions) unrelated to the vaccine was in fact the sole cause (thus excluding the vaccine as a substantial factor)."  *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347,1354 (Fed. Cir. 2008) (emphasis omitted).  Comparable to what a petitioner must show in a cause-in-fact case, respondent must show a logical sequence of cause and effect linking the injury to the proposed factor unrelated.  *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1368-69 (Fed Cir. 2013).  It need not be scientifically certain but must be legally probable.  *Id*.  In this case, respondent has not asserted that he has made any such showing.  (*See* ECF No. 61.)

## V.    Conclusion

For the reasons discussed above, I find that petitioner suffered a Table Injury of SIRVA following receipt of her May 7, 2018 Tdap vaccination and affecting her left shoulder.  Although petitioner alleged bilateral SIRVAs/shoulder injuries, she has not substantiated that her right shoulder symptoms either constituted a Table SIRVA or were caused-in-fact by her vaccination.  A separate damages order will be issued.

20

21

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master